WILLIAM A. HALL, PLAINTIFF IN ERROR, *v.* JOSEPH L. PAPIN

An act of Congress passed on the 15th of May, 1829, (3 Stat. at L., 605,) authorizes persons who claim lots in the village of Peoria, in Illinois, to notify the register of the land office, who was directed to report to the Secretary of the Treasury, to be laid by him before Congress.

An act of March 3, 1823, (3 Stat. at L., 786,) grants to each one of the settlers who had settled on a lot prior to the 1st of January, 1813, the lot so settled on and improved, where the same shall not exceed two acres; and where the same shall exceed two acres, every such claimant shall be confirmed in a quantity not exceeding ten acres: *Provided,* the right of any other person derived from the United States, or any other source whatever, &c., shall not be affected.

These two statutes were drawn into question in the case of Bryan et al. *v.* Forsyth, 19 Howard, 334, where it was ruled that "in the interval between 1823 and the survey a patent was taken out, which was issued subject to all the rights of persons claiming under the act of 1823. This patent was controlled by the subsequent survey."

In the present case the patent is not controlled by the subsequent survey, for the following reasons:

The old village of Peoria was settled very early in the history of the country, but abandoned before the years 1796, 1797, and the new village of Peoria built up at the distance of a mile and a half,

The act of March, 1823, applies only to the new town, and the land in question is an out-lot or field of ten acres near the old village of Peoria.

Papin, the plaintiff below, claimed under a plat of the village made in May, 1837, approved September, 1841, and a deed to himself from the confirmee made in 1854.

Hall, the defendant below, claimed under a pre-emption certificate of 1833, a patent from the United States in 1837 to Seth and Josiah Fulton, and a deed to himself from the patentees in 1838.

Supposing that no out-lot was meant to be confirmed, the inchoate right of the claimant under the act was subject to a survey and designation before it could be matured into a title.

An instruction given by the court below to the jury, viz: that the persons taking under the patent of March 18, 1837, and under the entry of July 11, 1833, must be considered as taking their grant subject to the contingency of the better title which might thereafter be perfected under the acts of 1820 and

*Hall v. Papin.*

1823; and when a party brought himself within those acts, his ' tle was the paramount title, notwithstanding the patent to the Fultons was erroneous.

So, also, it was error in the court below to refuse to instruct the jury, that if they believed from the evidence that by the plaintiff's recovering in this case the legal representatives of Willette would be confirmed in more than ten acres of Peoria French claims, they were to find for the defendant.

The true construction of the act is, that a claimant was to have one confirmation of "a lot so settled and improved," which had been claimed and entered in the report of the register of the land office at Edwardsville, in pursuance of the act of May 15, 1820; that no claimant, though he shall appear in the register's report as having made several claims, could, after having had one of them confirmed, transfer any right of property in the others to any person whatever.

THIS case was brought up by writ of error from the Circuit Court of the United States for the northern district of Illinois.

The dispute arose under the two acts of Congress passed in 1820 and 1823, confirming the claims of settlers in the village of Peoria, which are particularly mentioned in the opinion of the court, and which were also examined in a case reported in 19 Howard, 334. The instructions of the court below are also set forth in the present opinion, which renders it unnecessary to state them in this place.

It was submitted on a printed argument by *Mr. Browning* for the plaintiff in error, and by *Mr. Merriman* and *Mr. Blair* for the defendant.

It will be observed that the principal point upon which the decision of this court turned was, that the lots in question were outside of the village of Peoria. *Mr. Browning* brought this point before the court in the following manner:

The plaintiff in error (defendant below) asked the court to instruct the jury, "that if they believed, from the evidence, that the original French settlement or improvement, upon which the plaintiff's claim in this suit is based, was not upon or within the northwest quarter of section three, in township eight north, in range eight east, of the fourth principal meridian, nor located upon that quarter section by the United States surveyor until after that quarter section was sold to

*Hall* v. *Papin.*

the Fultons by the United States, they, the jury, are to find for the defendant."

Which instruction the court refused to give; but, on the contrary, instructed the jury that the acts of Congress of 1820 and 1823, taken in connection with the report of the register of the land office and the survey under the authority of the law, vested in the party entitled under the acts of Congress an absolute right of property in the lot so surveyed; and that the surveys, for the purposes of this action, made the title of the claimant, under the acts of Congress, complete; and that the persons taking under the patent of March 18, 1837, as well as of the entry of July 11, 1833, being the same grant, took their grant subject to the contingency of the better title which might thereafter be perfected under the acts of 1820 and 1822; and that when a party brought himself within these acts, his title was the paramount title, notwithstanding the patent to the Fultons.

Now, this instruction virtually admits that the land in controversy never had been settled upon or improved by any of the French or Canadian inhabitants of the village of Peoria, and that it was no part of the village, but quite and altogether outside of and beyond its limits; for the defendant below had proven this state of fact, or given evidence strongly tending to prove it; and the court told the jury, substantially, that it was wholly immaterial whether it had ever been settled upon and improved or not, or whether it had ever been a part of the village of Peoria or not; for that the title of the plaintiff, by virtue of the laws of 1820 and 1823, and by virtue of the survey made, not upon the land of the United States, but upon the land of the Fultons, was made absolute, and paramount to the title of the Fultons, notwithstanding the Fultons had the first grant from the Government. Or, to put it in another form, the instruction amounted simply to this: That on the 11th July, 1833, and the 18th March, 1837, when the land was sold and patented to the Fultons, said land belonged, absolutely and exclusively, to the United States, and that the French settlers at Peoria had no right to or interest in it, inasmuch as they had never had any settlement or improvement upon it,

and it had never been any part of their village; that the Government owning it, had a right to do with it as it pleased, and that in the exercise of that right it had sold and granted it to the Fultons, thereby parting with all its right, title, and interest in it, and all power and control over it; but that, notwithstanding this, it could authorize a survey of it under a law which had no reference whatever to this land, but to land upon which the French had settled and improved; and by virtue of such survey, take Fultons' land and appropriate it to the satisfaction of a French claim, which, in reference to this land, had never had an existence.

Now, let it be conceded, as it is by the instruction of the court, that there was never any French settlement or improvement on this land, and that it was no part of the village of Peoria—then, I ask, by what right, or upon what principle, it can be taken for the satisfaction of a claim in the village of Peoria, after it has ceased to be the property of the United States and has become the property of a private citizen? I freely concede that whilst it remained the property of the United States they could authorize any part, or the whole of it, to be given in satisfaction of French claims, although the French settlements and improvements had never been on or near it. But I do not comprehend how, after the Government had parted with its interest, had sold and conveyed to the Fultons, it could authorize it to be taken for the satisfaction of a French claim, or for any other purpose. Its power over it was gone, and it could no more take this than it could take land situated anywhere else, which it had previously sold and granted away.

It is admitted that the surveyor might go outside of the original French settlement and locate a claim upon any land belonging to the Government, for the Government had a right to do as it pleased with its own, and to authorize the location of a claim where no settlement had previously been, and to confirm such location after it was so made; but it is emphatically denied that he could go outside of the original settlement and locate upon the land of an individual, in which the Government had no interest. If he could go off the set-

tlement, outside of the village at all, where was he to stop? what limit was there to his discretion or power? If he could go a half mile, could he not go a mile? and if one, could he not go ten? Could he not, in fact, go to the uttermost bounds of the land district? Mere contiguity of Fultons' land to the old French village of Peoria gave the French claimants no more right to it than they had to land situated ten miles distant; and which had been sold by the United States after the passage of the laws of 1820 and 1823. Yet the court told the jury that although no part of the original French settlement or improvement, upon which the claim is based, was upon the land sued for, nor located upon it by the United States surveyor until after it had been sold to the Fultons by the United States, still, the Fultons took the land subject to the contingency of its being thereafter taken from them to satisfy this French claim. How did the Fultons take their land subject to such a contingency, any more than other purchasers from the Government? There had originally been no French settlement upon it, and when they bought, no claim had been surveyed or located upon it. When the United States sold, its title was perfect and the land unincumbered, and they sold and granted absolutely, unconditionally, and without reservation of any kind or character. It was no part of the contract between the Fultons and the United States that they should take the land subject to the contingency of its being afterwards retaken and disposed of to another. If they took their land subject to such a contingency, did not every other person in that land district who purchased land from the United States, after the passage of the laws of 1820 and 1823, take it subject to the same contingency? There was nothing in the character or quality of the land purchased by the Fultons, nor in the nature of their contract with the United States, to distinguish them from other purchasers from the Government. They took upon the same terms, and they held by the same tenure, with all others who purchased land to which the Government had title; and I ask again, what was there in this transaction to distinguish it from any other case of an absolute and unconditional sale of land by the United

States, to which they had title, or to subject the Fultons to the contingency of having it taken from them, after they had fairly bought it, paid for it, and received a patent therefor? If they are to be made an exception to all the general rules of law and property, they ought, at least, to be informed why. It is not because there had been a French settlement and improvement upon their land, for this is disproved. Not because it had been surveyed, and a French claim located thereon before they bought, for no such thing had been done. Not because they made a conditional purchase, for the United States conveyed to them absolutely, and without condition or reservation. No reason whatever is perceived for making an exception of this case.

If the instructions given by the court to the jury are right, it must be because they contain a general principle of law, applicable to all cases in the same land district with Peoria, for there is nothing in this case to distinguish it from any other; and that general principle, as declared by the court, is, that all persons who purchased from the United States in that land district, after the passage of the laws of 1820 and 1823, took their land subject to the contingency of having it retaken, to satisfy French claims. This certainly cannot be so.

Upon this point, *Mr. Merriman* remarked as follows:

The second assignment of errors is upon the refusal of the court to grant the instructions asked by the defendants below. The first of which is, that if the jury should believe, from the evidence, the original French settlement upon which the suit is based was not upon or within the N. W. 3, 8 N., 8 E., nor located thereon by the United States surveyor until after that quarter section had been sold by the United States to the Fultons, they should find for the defendant, which instruction was refused; and the third instruction of the court was given upon that point—to which instruction the court is referred.

The instruction, as asked, was improper, for two reasons: first, there was no evidence tending to show a different location of the lot in controversy; and secondly, for the reasons stated in the said instruction of the cou t. The lot was grant-

ed to the settler or his legal representative in 1823, while the land belonged to the Government; and by the terms of the act, the located lot was to be designated, surveyed, and set apart to such settler, by the surveyor of the district. This survey was a duty enjoined upon the said officer, and it was a portion of the grant, and, as such, was notice to all persons afterwards purchasing of Government. Although the report of Edward Coles, containing a diagram of said claims, did not state, in numbers, the township, range, or section, upon which said settlement was made, yet it stated the location of said village so fully and particularly, together with its village lots and out-lots, that although, perhaps, the precise boundaries could not be ascertained without a survey, yet no one, by looking at the report and diagram of Coles, and comparing it with the sectional map of the township, including said village, could avoid the conclusion that this lot, thirteen, was wholly or in part on the quarter section claimed by plaintiff in error; the location of the village on the lake, the distance of this lot from the main village, the size of the lots between this lot and the main village, was sufficient notice of the probable location of this lot; and this, followed up by the fact that this village and out-lots were mostly located by the surveyor on said section three, and the evidence in this case of the marks of the old French cultivation, and which must have been plainer still at the time of the first settlement of said quarter section, are, we think, sufficient evidence of notice, if notice had been required. The courts will take judicial notice of all acts of Congress, as well as of the location of the different townships, ranges, and sections, by their Congressional divisions.

The record shows a space of time between the survey of the lot and the approval of such survey of over three years, during which time, if there were any objections to such survey, the parties interested should have filed their objections with the surveyor of said district. It cannot be said that they did not have plenty of time and opportunity for so doing.

Mr. Justice WAYNE delivered the opinion of the court.

This is a suit for the recovery of ten acres of land, which is

admitted by the parties to be a part of the northwest quarter of section three, in township eight north, of range eight east, of the fourth principal meridian, in the district of lands subject to sale formerly at Springfield, Illinois, and afterwards at Quincy.

Upon the trial below, the plaintiff gave in evidence: 1st, the act of Congress of May 15, 1820, entitled, an act for the relief of the inhabitants of the village of Peoria, in the State of Illinois; 2d, the act of the 3d March, 1823; 3d, the report of Edward Coles, in the 3d vol. State Papers, page 421; 4th, the special and general plat and field-notes of the survey of the village, made May 11, 1837, approved September 1, 1841, and approved by the surveyor of public lands in Illinois and Missouri; 5th, the deed of lot 13 by Bartholomew Fortier and his wife, Angelica, to plaintiff, September 23, 1854; 6th, depositions showing that Angelica was the only representative of Francis Willette, and that, when she made her claim before J. W. Coles, she was the wife of Louis Pilette, and that she married Fortier in 1838.

The defendant below, here the plaintiff in error, introduced in evidence a patent from the United States to Seth and Josiah Fulton, dated March 18, 1837, a pre-emption certificate of the same, laid July 11, 1833, and a conveyance by the Fultons to him of the land covered by the patent dated the 11th July, 1838. The patentees, Seth and Josiah Fulton, had lived upon the quarter section for several years before their entry was made, and Hall, also, had occupied the quarter section for some years before the Fultons sold to him. Also, a patent from the United States to the representatives of Francis Willette, for a lot which had been claimed by them under the act of the 3d March, 1823, and sundry depositions, which it is not necessary for us to notice in this opinion.

The defendant in error, Joseph L. Papin, claims the ten acres sued for in virtue of his purchase from Bartholomew Fortier, and Angelica, his wife, she being the sole representative of her father, and had claimed the land under the act of Congress of the 15th May, 1820, 3 Stat. at Large, 605, and that of the 3d March, 1823, U. S. Stat. at Large, 786.

The first of these acts declares, that "every person, or the legal representatives of any person, who claims a lot or lots in the village of Peoria, in the State of Illinois, shall, on or before the first day of October next, deliver to the register of the land office for the district of Edwardsville a notice in writing of his or her claim, and it shall be the duty of the register to make to the Secretary of the Treasury a report of all claims filed with him, with the substance of the evidence in support thereof; and also his opinion, and such remarks respecting the claim as he may think proper to make; which report, with a list of the claims which, in the opinion of the register, ought to be confirmed, shall be laid by the Secretary of the Treasury before Congress for their determination." Under this act claims were made by Louis Pilette in right of his wife, Angelica, the daughter of Francis Willette, and they appear in the register's report, dated the 10th November, 1820, entered as numbers 11, 12, and 13. That report, however, was not finally acted upon by Congress until the 3d March, 1823. The first section of that act declares, "there is hereby granted to each of the French and Canadian inhabitants, and other settlers in the village of Peoria, in the State of Illinois, whose claims are contained in a report made by the register of the land office at Edwardsville, in pursuance of the act of Congress approved May 15, 1820, and who had settled a lot in the village aforesaid prior to the first day of January, 1813, and who have not heretofore received a confirmatory claim or donation of any tract of land or village lot from the United States, *the lot so settled upon and improved,* where the same shall not exceed two acres; and where the same shall exceed two acres, every such claimant shall be confirmed in a quantity not exceeding ten acres : Provided, nothing in this act contained shall be so construed as to affect the right, if any such there be, of any other person or persons to the said lots, or any part of them, derived from the United States, or any other source whatever, or be construed as a pledge on the part of the United States to make good any deficiency occasioned by any other interfering claim or claims." And it was made the duty of the surveyor of the public lands of the United States

for that district to cause a survey to be made of the several lots, and to designate in a plat thereof the lots confirmed and set apart to each claimant, and forward the same to the Secretary of the Treasury, who shall cause patents to be issued in favor of such claimants, as in other cases.

The land sued for is described in the declaration as an out-lot or field of ten acres, near the *old village of Peoria,* in the State of Illinois, *confirmed* to Louis Pilette in right of his wife, Angelica, the daughter of the late Francis Willette, by the act of Congress of the 3d March, 1823, entitled "An act to confirm certain lots in the village of Peoria, it being claim No. 13 of the report made by the register of the land office at Edwardsville, in pursuance of an act of Congress of the 15th May, 1820." The lot is claimed in the report of the register as an out-lot or field, containing fifteen or twenty arpents of land, situated three-fourths of a mile northeastwardly (northwestwardly) from the village of Peoria. There can be no uncertainty whether the old or new village was meant, as the survey establishes it to have been near the old; and in our consideration of the act of the 3d March, 1823, our conclusion is, that that act can only embrace lots in the new village, or others appertaining to it.

The old village of Peoria was situated on the northwest shore of Lake Peoria, about one mile and a half above the lower extremity or outlet of the lake. The village had been established by Frenchmen at an early date, previous to the recollection of any one. About the years 1778, 1779, the first house was built on what was then called La Ville de Maillet, *afterwards the new village of Peoria,* and afterwards known by the name of Fort Clark. It was situated about one mile and a half below the old village, immediately at the lower front or outlet of the lake. This situation was preferred on account of the water being better and the place more healthy than at the old village. In consequence, the inhabitants gradually deserted the old village, and before the years 1796, 1797, had entirely abandoned it, and removed to the new village.

The inhabitants were generally Indian traders, hunters, and voyagers. They formed a link of connection between the

French residing on the waters of the great lakes and the Mississippi river. From that happy facility of adapting themselves to their situation and associates for which the French are so remarkable, the inhabitants of Peoria generally lived in harmony with their savage neighbors. But about the year 1781, an apprehension of Indian hostilities induced them to abandon the new village. They returned to it, however, after the peace of 1783, between England and the United States and the powers which had engaged in our revolutionary war, and continued there until the autumn of the year 1812. Then they were forcibly removed from it and their village destroyed by a Captain Craig, of the Illinois militia, on the ground, it was said, that himself and his company had been fired upon in the night by Indians, while at anchor in their boats before the village, with whom Craig suspected the villagers to be on too intimate and friendly terms. Craig and his company were in the service of the United States. The inhabitants of Peoria settled there without any grant or permission from any Government. Each person took such a portion of unoccupied land as he wished to occupy and cultivate; but as soon as he abandoned it, his right to the land ceased with his possession, and it reverted to its natural state. It was then liable to be improved and cultivated by any who thought proper to take possession. Sometimes a settler sold out his improvements before abandoning. That and the itinerant character of the inhabitants, account for the number of persons who claimed the same lot. As was usual in French villages, the lots in the village were small. They were large enough for houses, out-houses, and gardens, and in some instances, those who were able to do so cultivated what were known as out-lots or fields near to, but outside or beyond, the village. Those out-fields were of different sizes, depending upon the industry and means of persons to till them. The village lots, as contradistinguished from out-lots, contained generally the half of an arpent. Neither the old nor new village had ever been surveyed or occupied upon any fixed plan. Seventy claims were made under the act of the 15th May, 1820. They were returned on the report of the register

to the Secretary of the Treasury, on the 10th of November, 1826. In a little less than three years the act of 1823 was passed. Coles's Report, 3 Am. State Papers, Land.

The narrative just given has an important bearing upon the construction of the acts of 1820 and 1823. It serves to show the locality of the village of Peoria, for which those acts were passed, the purposes to be accomplished, and the extent and conditions upon which a lot may be confirmed to a claimant who had *settled and improved a lot* in the village before the first day of January, 1813, and who had not before received a confirmation of claims, or donation of any tract of land or village lot from the United States, when the lot settled upon and improved did not exceed two acres; and when it did, to confirm to the claimant ten acres, subject to the proviso in the act.

It was a gratuity to such settlers of a single lot in the village. Such was the first section of the act of 3d March, 1823. It gave to the claimant an incipient or inchoate right to a lot, when, in conformity with the second section of the act, a survey had been made of the several lots reported by the register, *with a designation or a plat thereof of the lot confirmed and set apart to each claimant.* When that had been done, the claimant became a confirmee under the act, and his right to the lot, as between himself and the United States, was complete. Such was the view taken by this court of the acts of 15th May, 1820, and of the 3d March, 1823, in Bryan and Forsyth, 19 Howard, 336. Its language then was, when the survey was made, and the plats returned and approved and recorded by the surveyor general of Illinois and Missouri, and recognised as valid at the General Land Office, it bound the parties to it, the confirmee and the United States.

The law was intended to grant the lot settled upon and improved, and no other land described as an equivalent. But, in this instance, no survey was made in conformity with the 2d section of the act until the 11th April, 1837. It was not examined and approved by the surveyor of the public lands in Illinois and Missouri until the first September, 1840, seven years after Seth and Josiah Fulton had made their entry upon the quarter section, and three years after they had received

their patent for it from the United States. The land was unconditionally sold to them. Hall, the plaintiff in error, bought from the Fultons in July, 1838. Under the decision of this court, already cited, no location of the out-lots could be made upon this quarter section after the patent had been issued to the Fultons. It follows, then, that there was no confirmation of the land sued for to the representative of Francis Willette; and, consequently, that the quit-claim conveyance by Angelica Fortier and her husband, of the 23d September, 1854, to Papin, the defendant in error, gave to her no title to the ten acres for which he has sued. We have shown that the inchoate right of the claimant under the act— supposing that no out-lot was meant to be confirmed—was subject to a survey and designation before it could be matured into a title. The requirement of a survey before a claimant could be considered as having a legal title to land upon a concession, has frequently been passed upon by this court; and the case before us is within that of Menard Heirs *v.* Massey, in 8 Howard, 309.

It now remains for us to consider two of the instructions which were asked by the defendant in the court below, which the court refused to give to the jury.

They were: If the jury believed from the evidence that the original French settlement or improvement, upon which the plaintiff's claim in this suit is based, was not upon or within the northwest quarter of section 3, in township eight north, in range eight, east of the 4th meridian, *nor located upon that quarter section by the United States surveyor until after that was sold to the Fultons by the United States, that the jury were to find for the defendant.*

The court did not give the first branch of the instructions asked, and, in our opinion, rightly so; for there was no proof in the case to show that the French settlement, which was the basis of the suit, was not a part of it. Indeed, no such instruction would have been asked; for it was admitted by the parties that the tract sued for was a part of the quarter section described in the patent to the Fultons. But the court refused, also, the second branch of the prayer, which, in our opinion,

should have been given, and gave the jury an instruction as follows: He told the jury that the acts of Congress of 1820 and 1823, taken in connection with the report of the register of the land office and the survey under the authority of law, vested in the parties entitled, under the acts of Congress, with an absolute right of property in the lot surveyed; and that Angelica, the person named in the evidence, was the daughter and sole heir of her father, Francis Willette, the settler; that she was within the meaning of the law; and her claim being in the report, was confirmed by the act of 1823.

And the jury was further instructed, that the survey of the claimed lots, as reported by the register, was duly made and approved, because the survey for the purposes of this action made the title of the claimants under the acts of Congress complete; and that the court was of the opinion that the persons taking under the patent of March 18th, 1837, and under the entry of July 11th, 1833, must be considered as taking their grant subject to the contingency of the better title which might thereafter be perfected under the acts of 1820 and 1823; and when a party brought himself within those acts, his title was the paramount title, *notwithstanding the patent to the Fultons.*

The defendant, in our view, had asked for such an instruction as he had a right to have under the authorities cited in a previous part of this opinion. The instruction given to the jury was erroneous.

The defendant had also asked in his second prayer, that the court would instruct the jury, if they believed from the evidence that by the plaintiff's recovering in this case the legal representatives of Willette would be confirmed in more than ten acres of Peoria French claims, that they were to find for the defendant. The prayer is inartificially drawn; but when taken in connection with the evidence in the case and the act of 1823, its purport could not have been misunderstood. The object of the defendant was to get an instruction from the court, upon the evidence he had given, in conformity with the limitation in the act, as to the quantity of land which could be confirmed to a claimant under it. It declares when the lot shall not exceed two acres, that it shall be confirmed: and

when the same shall exceed two acres, that every such claimant shall be confirmed in a quantity not exceeding ten acres.

· Pilette, the husband of Angelica, had filed in her behalf, in the year 1820, before the register, claims for lots eleven, twelve, and thirteen. The first, being the land numbered as number eleven, contained about one-half of an arpent of land; number twelve the same quantity, situated directly in the rear of eleven, and separated from it by a street; number thirteen was a claim for an out-lot or field, containing fifteen or twenty acres of land, and situated about three-fourths of a mile north-eastwardly (northwestwardly) from the village of Peoria; number eleven was also claimed before the register by Felix Fontain, his claim being in the report No. 41; but it turned out, according to the survey, that both were for the same land, and that they covered the southwest part of Etienne Barnard's claim number 1, the northeast part of it being also covered by another claim of Felix Fontain, numbered in the survey as 42. For land so described, containing fifty-four thousand eight hundred and ninety and fourteen-hundredths of a square foot, designated as covered by the claims one, eleven, forty-one, and forty-two, a patent was issued by the United States to the representatives of Francis Willette, on the 28th August, 1845. That patent was introduced in evidence by the defendant below, the plaintiff in error. The purpose was to show that the heirs of Willette having already had one confirmation of "a lot *settled and improved*," under the act of 3d March, 1823, that they were not entitled to another, or to any confirmation of the title to the land in litigation. If that were allowed, they would get more than the ten acres, to which every claimant was limited by the act. Our construction of the act is, that a claimant was to have one confirmation of "a lot so settled and improved," which had been claimed and entered in the report of the register of the land office at Edwardsville, in pursuance of the act of the 15th May, 1820; that no claimant, though he shall appear in the register's report as having made several claims, could, after having had one of them confirmed, transfer any right of property in the others to any persons whatever.

*Eberly et al. v. Moore et al.*

Papin, the plaintiff below, took from the representatives of Willette a quit-claim conveyance for the land for which he sues on the 23d September, 1854—more than thirty years after the passage of the act of the 3d March, 1823—more than twenty years after the Fultons had made their entry upon the quarter section—eighteen years after they received their patent for it from the United States—seventeen after Hall had the land in possession by purchase from the Fultons, and ten years after the patent of confirmation to the representatives of Willette had been recorded in the General Land Office. Under these circumstances, Papin took a conveyance, which gave him no right to the land. When the plaintiff in error, Hall, asked the court to instruct the jury, that if they believed from the evidence that, by the plaintiff's recovery in this case, the legal representatives of Francis Willette will have been confirmed in more than ten acres of Peoria French claims, they were to find for the defendant, the prayer ought to have been apprehended by the court, according to its relation to the subject-matter in controversy, and such an instruction should have been given accordingly to the jury. The refusal, then, was error.

For the reasons given, we shall direct the judgment of the court below to be reversed; that a *venire facias de novo* shall be issued; and that the court, in its further proceedings in the cause thereon, conform to the rulings of this opinion.